**NORTH AMERICAN SAVINGS BANK, Appellee,**

v.

**RESOLUTION TRUST CORPORATION as Receiver of Valley Federal Savings Association, Appellant.**

**No. 94–3489.**

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1995.

Decided Sept. 7, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 12, 1995.

Thomas J. Fritzlen, Jr., Kansas City, MO, argued (Steven M. Leigh, on the brief), for appellant.

David R. Frensley, Kansas City, MO, argued (Craig Towerman, on the brief), for appellee.

Before MAGILL and HANSEN, Circuit Judges, and GOLDBERG,* Judge.

GOLDBERG, Judge.

The Resolution Trust Corporation as Receiver of Valley Federal Savings and Loan (the "RTC") appeals the district court's hold-

---

* The HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation.

ing denying it declaratory relief and damages for breach of a letter agreement between Valley Federal Savings and Loan ("Valley Federal") and North American Savings Bank ("North American"). The district court entered summary judgment against the RTC after finding that the parol evidence rule barred the letter agreement from serving as part of a final contract between Valley Federal and North American. We reverse the judgment of the district court and remand for further proceedings.[1]

## I. BACKGROUND

In February of 1984, North American (then known as North American Savings Association) committed to make a loan to the Triland Investment Group in the amount of $19,750,000 (the "Triland Loan"); this loan was to be secured by a piece of property located in Dallas, Texas (the "Texas Property"). After North American committed to making the Triland Loan, North American's Vice President, Kurt Lutz, contacted one of Valley Federal's officers, Earl Massie, to see if Valley Federal would participate in the loan. On October 19, 1984, Valley Federal's board of directors decided that Valley Federal could participate in the Triland Loan, if North American would guarantee the first $3 million in losses realized by Valley Federal.

North American instructed its lawyers to draft a document that would induce Valley Federal to participate in the Triland Loan by guaranteeing the first $3 million in losses realized by Valley Federal. In response, North American's lawyers drafted a document on North American letterhead (the "Letter Agreement") that provides, in pertinent part:

> In the event of default in the loan resulting in foreclosure thereof, seller agrees upon demand of buyer to reimburse buyer for buyers [sic] realized loss actually sustained up to but not exceeding the sum of $3 million. Realized loss means the full and actual loss sustained by buyer after foreclosure is completed and all distributions have been made of the funds available for

payment of the debt including the proceeds of such foreclosure. Upon payment by seller to buyer of the lesser of the amount of such realized loss or $3 million, buyer shall assign, transfer and deliver to seller all of the right, title and interest of buyer in the loan, in this Participation Agreement and in the Participation Certificate evidencing the interest of buyer in said loan.

On October 23, 1984, North American's Vice President, Kurt Lutz, signed the Letter Agreement, as well as a Loan Participation Certificate ("LPC") and a Loan Participation Agreement ("LPA"), and forwarded the documents to Valley Federal. In an accompanying letter, Mr. Lutz noted that he had enclosed the documents concerning the loan participation, including "the $3 million guarantee" prepared by North American's attorneys. Upon receiving the three documents, Valley Federal's Vice President, Earl Massie, had the documents signed and wired North American the funds to purchase a participation interest in the Triland Loan. He then returned the executed documents to North American.

The Triland Loan eventually went into default. Consequently, North American held a foreclosure sale of the Texas Property that secured the loan. On October 3, 1989, North American successfully bid $9.5 million in foreclosure and obtained a deed of trust for the Texas Property.

Soon after the foreclosure sale, on October 18, 1989, the Office of Thrift Supervision ("OTS") declared Valley Federal insolvent. OTS caused a new federal charter to be issued to Valley Federal and appointed the RTC as conservator of Valley Federal. On November 27, 1989, Valley Federal and the RTC sent a letter to North American discussing whether North American could sell the Texas Property to a third party. The letter provided that Valley Federal and the RTC believed that the participation agreement allowed North American to sell the Texas Property to a third party, so long as North American honored "its agreement to

---

**1.** We note that during the course of this appeal, North American filed a motion for leave to file a rebuttal brief. We have granted North American's motion and considered its rebuttal brief in reaching our decision.

fund to Valley Federal the first $3,000,000.00 of loss suffered as a result of the sale." North American has not yet sold the Texas Property to a third party.

Almost three years after Valley Federal sent the letter regarding the sale of the Texas Property to North American, the RTC as receiver of Valley Federal made certain demands of North American based upon the Letter Agreement. Specifically, on July 31, 1992, the RTC demanded the payment of $3 million as well as 75.949% of the proceeds from any sale of the Texas Property and any judgment against the Triland debtors. In response, North American filed an action for declaratory relief, making the following claims: (1) the Letter Agreement is unenforceable because of an integration clause in the LPA; and (2) even if the Letter Agreement were effective, it would not entitle the RTC to immediate remuneration because no proceeds have been received from the foreclosure on the Texas Property, and the RTC has elected to remain a participant in the Triland Loan by holding the Texas Property for resale. The RTC responded by filing a counterclaim seeking the following forms of relief: (1) a declaration that the Letter Agreement entitles the RTC to all that it asked for in its July 31st demand letter; and (2) damages for breach of contract. North American replied that waiver, estoppel, lack of consideration, and antecedent breaches bar the RTC's counterclaim.

North American eventually filed a motion for judgment on the pleadings or summary judgment. In response, the RTC filed a cross-motion for summary judgment. On September 6, 1994, the United States District Court for the Western District of Missouri held that because the Letter Agreement was made either prior to or contemporaneously with the LPA, the parol evidence rule bars the Letter Agreement from being a part of the final loan participation contract between North American and Valley Federal. The district court therefore granted summary judgment in favor of North American.

## II. *DISCUSSION*

■ On appeal, the RTC argues that the district court erred in finding that the parol evidence rule bars the Letter Agreement from serving as a part of the loan participation contract between North American and Valley Federal. The RTC asserts that under Missouri law, the Letter Agreement should be read in conjunction with the LPA and the LPC as a single contract. We agree.

■ The parol evidence rule generally bars the admission of extrinsic evidence of a prior or contemporaneous agreement that contradicts the terms of an unambiguous and complete written contract, if the written contract is untainted by fraud, mistake, accident, or erroneous omission. *Union Elec. Co. v. Fundways, Ltd.*, 886 S.W.2d 169, 170 (Mo. App.1994); *Wulfing v. Kansas City S. Indus., Inc.*, 842 S.W.2d 133, 146 (Mo.App. 1992). The purpose of the parol evidence rule is to preserve the sanctity of a written agreement that is fully integrated. *Missouri Sav. Ass'n v. Home Sav. of Am.*, 862 F.2d 1323, 1326 (8th Cir.1988). Hence, the rule does not apply unless the written agreement at issue is completely integrated. *Wulfing*, 842 S.W.2d at 146.

■ In a case involving the parol evidence rule, the threshold issue for the court to decide is whether the parties intended to integrate their entire agreement into a particular document or documents. *Missouri Sav. Ass'n*, 862 F.2d at 1326. In making this determination, the court reviews all evidence relevant to the issue. *Paglin v. Saztec Int'l, Inc.*, 834 F.Supp. 1184, 1192 (W.D.Mo.1993); *Wulfing*, 842 S.W.2d at 146–47. Indeed, the court may consider evidence of prior or contemporaneous negotiations and agreements in determining whether the parties intended for a particular written contract to be complete. *Wulfing*, 842 S.W.2d at 147; *see, e.g., Paglin*, 834 F.Supp. at 1193.

■ In reviewing the relevant evidence, the court may find that several documents together form a single contract under Missouri law. *Missouri Sav. Ass'n*, 862 F.2d at 1326; *Paglin*, 834 F.Supp. at 1192–93. This is because Missouri law provides that multiple instruments executed at the same time and relating to the same transaction may be read together. *Missouri Sav. Ass'n*, 862 F.2d at 1326; *Paglin*, 834 F.Supp. at 1192–

93; *Missouri Farmers Ass'n v. Barry*, 710 S.W.2d 923, 926 (Mo.App.1986); *Merz v. First Nat'l Bank of Franklin County*, 682 S.W.2d 500, 502 (Mo.App.1984). Moreover, under Missouri law, the court may find that the parties intended for several documents to serve as a single contract, even if one of those documents contains an integration clause. *Missouri Sav. Ass'n*, 862 F.2d at 1326.

In this case, the evidence shows that all of the documents at issue were executed at the same time. North American's Vice President, Kurt Lutz, signed the Letter Agreement, the LPA, and the LPC on October 23, 1984. Mr. Lutz then sent the three documents to Valley Federal. Upon receipt, Vice President Massie had the documents signed, caused the money to purchase the participation interest to be wired to North American, and then returned the documents to Mr. Lutz on or about October 26, 1984.

In addition, the evidence shows that the LPA, the LPC, and the Letter Agreement indisputably concern the same subject, i.e. the loan participation between North American and Valley Federal. All of the documents expressly discuss Valley Federal's purchase of a participation interest in the Triland Loan. Further, the Letter Agreement specifically references the "Participation Agreement" and the "Participation Certificate," and the Letter Agreement refers to itself as being a part of "this Participation Agreement."

Other relevant evidence also shows that the parties intended for the Letter Agreement to be a part of their loan participation contract. The evidence shows that Valley Federal's board of directors would only agree to let Valley Federal participate in the Triland Loan if North American guaranteed the first $3 million in actual losses realized by Valley Federal; indeed, it was reasonable for Valley Federal to require such security as it was purchasing a 75.949% interest in a $19,750,000 loan. In addition, the evidence shows that Kurt Lutz, the officer who negotiated the loan participation and executed all of the related documents on behalf of North American, believed that the Letter Agreement required North American to reimburse Valley Federal for $3 million in realized loss actually sustained.

We conclude that the evidence, viewed in the light most favorable to North American, clearly shows that North American and Valley Federal intended for the Letter Agreement, the LPA, and the LPC to serve as the complete expression of their agreement. Therefore, we find that neither the parol evidence rule nor the integration clause in the LPA render the Letter Agreement invalid. Rather, we find as matter of law that the Letter Agreement, the LPA, and the LPC together comprise the parties' agreement regarding Valley Federal's participation in the Triland Loan.

### III. CONCLUSION

In accordance with our finding that as a matter of law the Letter Agreement, the LPA, and the LPC comprise the loan participation contract between the parties, we reverse the decision of the district court and remand this case. Issues remain concerning interpretation of the contract, waiver, estoppel, realization of loss, and antecedent breaches. On remand, the district court shall address such remaining issues.